**UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA**, | : | |
| | : | |
| Plaintiff, | : | Case No. 3:21-CR-61 |
| | : | |
| v. | : | Judge Thomas M. Rose |
| | : | |
| **WILLIAM S. HITCHINGS, V**, | : | |
| | : | |
| Defendant. | : | |

_____

**ENTRY AND ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS
STATEMENTS (DOC. NO. 31)**
_____

Pending before the Court is Defendant William S. Hitchings' Motion to Suppress Statements (Doc. No. 31) (the "Motion"). In the Motion, Defendant William Sidney Hitchings, V ("Hitchings") seeks to exclude statements he made to investigators on February 9, 2021, as well as "any derivative evidence arising from" those statements. (Doc. No. 31 at PageID 130.) Hitchings argues that his Fifth Amendment rights were violated during his February 9, 2021 interview. (Doc. No. 34 at PageID 192.) For the reasons explained below, the Court **DENIES** the Motion.

**I.  BACKGROUND**

On February 9, 2021, agents and officers of the Federal Bureau of Investigation ("FBI"), Troy Police Department ("TPD"), and Dayton Police Department ("DPD") executed a search and arrest warrant for: "(1) the residence at 924 East Main Street, Troy, Ohio, 45373; (2) the person of WILLIAM SIDNEY HITCHINGS V; and (3) 2011 Chevrolet Tahoe bearing Ohio license plate JEA3406." (Doc. No. 34-1 at PageID 203.) At approximately 6:00 a.m., agents from the FBI's SWAT team and officers of the TPD arrived at 924 East Main Street, Troy, Ohio and announced

1

their presence. (*Id*.) Hitchings was handcuffed and placed in the back of a TPD patrol vehicle. (*Id*. at PageID 203-04.)

Hitchings was transported to the Troy Police Department by Officer Jeffrey Kunkleman ("Kunkleman") of the TPD and Special Agent Andrea Kinzig ("Kinzig") of the FBI. (*Id*. at PageID 204.) Hichings was taken into the interview room at approximately 6:27 a.m. (Doc. No. 34-2 at PageID 206.) At approximately 6:32 a.m. Kunkleman and Kinzig entered the interview room and removed Hitchings' handcuffs. (*Id*. at PageID 207.)

During the initial stages of the interview, Kinzig established that Hitchings' first language is English, that he can read and write, and that he had received a high school diploma with vocational training in computer networking. (Government Exhibit 1 at 6:43:25-6:44:00.) Kinzig then read Hitchings his *Miranda* rights, and Hitchings confirmed that he understood his rights. (*Id*. at 6:44:00-6:44:55.) Hitchings then signed a form confirming that he understood what his rights were and that he would answer questions without an attorney present. (*Id*. at 6:44:56-6:45:15; Government Exhibit 2.) Hitchings refused to answer several questions during the initial part of the interview, including refusing to give Kinzig the passwords to his servers. (Government Exhibit 1 at 6:55:58-6:56:00; 6:58:52; 7:08:42-7:08:46; 7:15:30-7:15:38; 7:15:38-7:16:16.)

At approximately 7:21 a.m., Hitchings admitted to having child pornography and material containing bestiality. (Government Exhibit 1 at 7:21:30-7:21:52.) At 7:22 a.m., the following exchange occurred:

> Hitchings: Lawyer. I have to have a lawyer from this point on. Don't I?
> Kinzig: It's up to you.
> Hitchings: I want to help you, but it doesn't matter. I'm already dead anyway, so it doesn't fucking matter. I'm not answering questions anymore until you find me an attorney. Please find me an attorney.
> Kinzig: Okay.
> Hitchings: That's what I'm supposed to do, right?
> Kinzig: It's your choice.

> Kunkleman: It's up to you, William.
> Hitchings: Tell me honestly, like what do you think I . . .
> Kunkleman: Look I'm going to tell you honestly, okay. You want my opinion?
> Hitchings: I do.
> Kunkleman: I think it's always better to cooperate. I think it goes better in the court system. . . . .

(Government Exhibit 1 at 7:22:20-7:22:58.)

After this exchange, Hitchings began punching himself in the head and was handcuffed by Kinzig and Kunkleman. (*Id*. at 7:23:40-7:24:45.) Kunkleman and Hitchings had an extended exchange regarding Hitchings' behavior in the room. (*Id*. at 7:24:45-7:26:01.) During this time Kunkleman stated, "[w]hy sit here and say, 'yeah I got child porn' and then shut up?" (*Id*. at 7:25:36-40.) During the extended exchange, Hitchings did not make any inculpatory or exculpatory statements.

After a couple minutes of Hitchings being in handcuffs, Kinzig began to pick up her bag and leave the room. (*Id*. at 7:26:01-7:26:40.) At the hearing on the Motion, Kinzig explained that she was leaving and planning to terminate the interview because Hitchings appeared to have asked for counsel. (Doc. No. 33 at PageID 159.) As Kinzig began to leave the interview room, Hitchings then told her, "wait, wait, wait, wait," and apologized for his outburst. (Government Exhibit 1 at 7:26:40-7:27:10.) Kinzig explained to Hitchings that he had asked for a lawyer, to which Hitchings replied, "[f]uck the lawyer." (*Id*. at 7:27:40-46.) Kinzig then told him that he asked for lawyer, so they are going to stop the interview, to which Hitchings responded by saying "no" several times. (*Id*. at 7:28:08-14.) Kinzig further stated that they can appoint a lawyer if he wants, and Hitchings stated, "I don't need a lawyer." (*Id*. at 7:28:18-25.) Kunkleman then asked Hitchings if he wanted a lawyer, and Hitchings replied, "I want one, but I don't need one." (*Id*. at 7:28:25-30.) Hitchings then repeatedly stated that he wanted to help them. (*Id*. at 7:28:30-48.) Kinzig further told Hitchings that she was not feeling comfortable because he had asked for an attorney. (*Id*. at

3

7:28:55-7:29:04.) Hitchings repeated that he will talk to her and then confirmed, "[n]o, I do not need a lawyer, no." (*Id*. at 7:29:04-25.) In total, the interview lasted for approximately five hours and forty minutes. (*See* Government Exhibit 1.)

On September 17, 2021, Hitchings filed the present Motion. (Doc. No. 31.) The Court held a hearing on December 9, 2021 (Doc. No. 33), and Hitchings filed a supplemental memorandum in support of the Motion on January 19, 2022. (Doc. No. 34.) The Government filed its response on February 8, 2022 (Doc. No. 35), and Hitchings filed his reply on February 18, 2022. (Doc. No. 36.) This matter is fully briefed and ripe for review.

## II. ANALYSIS

Hitchings argues that he was subject to a custodial interrogation because a reasonable person would not have felt free to leave in his situation. (Doc. No. 34 at PageID 193-94.) He further argues that he did not voluntarily, knowingly, and intelligently waive his *Miranda* rights. (*Id*. at PageID 194-97.) Hitchings alternatively argues that he invoked his right to counsel. (*Id*. at PageID 197-99.) Finally, he argues that his incriminating statements were not made freely or voluntarily. (*Id*. at PageID 200-01.)

### a. The Fifth Amendment and *Miranda*

The Fifth Amendment states that a defendant cannot be "compelled in any criminal case to be a witness against himself." U.S. CONST. amend. V. In *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602 (1966), the Supreme Court held that a suspect under custodial interrogation must be advised of their Fifth Amendment right against self-incrimination. *United States v. Crossley*, 224 F.3d 847, 861 (6th Cir. 2000); *United States v. Dixon*, No. 3:15-cr-81, 2016 U.S. Dist. LEXIS 63450, at *5 (S.D. Ohio May 13, 2016). Statements made in response to interrogation while in custody are not admissible unless the defendant has been apprised of their Fifth Amendment right

against self-incrimination and the defendant has validly waived this right. *United States v. Binford*, 818 F.3d 261, 271 (6th Cir. 2016) (citing *United States v. Cole*, 315 F.3d 633, 636 (6th Cir. 2003)). A defendant's waiver of their *Miranda* rights must be voluntary, knowing, and intelligent. *Bush v. Warden, Southern Ohio Corr. Facility*, 573 F. App'x 503, 510 (6th Cir. 2014) (citing *Edwards v. Arizona*, 451 U.S. 477, 483, 101 S. Ct. 1880 (1981)). The government bears the burden of proving the voluntariness of an accused's *Miranda* waiver and confession by a preponderance of the evidence. *Binford*, 818 F.3d at 271.

b. **Custodial Interrogation**

The *Miranda* rule is limited to custodial interrogations, which have been defined as "'questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in a significant way.'" *United States v. Salvo*, 133 F.3d 943, 948 (6th Cir. 1998) (quoting *Oregon v. Mathiason*, 429 U.S. 492, 494, 97 S. Ct. 711 (1977)); *United States v. Fein*, 843 F. App'x 765, 771 (6th Cir. 2021). In evaluating whether a defendant was in custodial interrogation, the court looks to the objective circumstances surrounding the interrogation to assess "'how a reasonable person in the position of the individual being questioned would gauge the breadth of his or her freedom of action.'" *United States v. Panak*, 552 F.3d 462, 465 (6th Cir. 2009) (quoting *Stansbury v. California*, 511 U.S. 318, 325, 114 S. Ct. 1526 (1994)). Courts consider multiple factors, including, whether a reasonable person would have believed they were free to leave; the purpose of the questioning; whether the place of the questioning was hostile or coercive; the length of the questioning; and, other indicia of custody. *Crossley*, 224 F.3d at 861. The other indicia of custody may include "whether the individual possessed unrestrained freedom of movement during the interview [or] whether the individual was told they need not answer the questions." *Panak*, 552 F.3d at 465.

Hitchings argues that he was in custody during his February 9 interview because he was transported to TPD in a police vehicle, while handcuffed. (Doc. No. 34 at PageID 193.) He further argues that other indicia of custody include the fact he was handcuffed while in the interrogation room, the door remained closed for the interview, one officer had a visible weapon, and the interview lasted over six hours. (*Id*. at PageID 194.) In response, the Government argues that the totality of the circumstances shows Hitchings was not in custody because he was not questioned aggressively or combatively, his freedom of movement was not restrained for most of the interview, and he was told he was free to leave at any time. (Doc. No. 35 at PageID 240-42.)

The Court finds that Hitchings was subject to a custodial interrogation. Hitchings was taken from his home immediately after it was raided by the FBI, TPD, and DPD. Hitchings was placed in handcuffs in the back of a police vehicle and transported to TPD. He was then placed in a windowless room with a closed door, while still handcuffed. Moreover, after Hitchings had an emotional outburst and began harming himself, he was placed in handcuffs again and ordered to keep his chair against the wall of the interrogation room. The door to the interrogation room also remained shut except for instances where Kunkleman or Kinzig would go to the door to retrieve items (such as water) or would leave the room entirely. Finally, Hitchings was subjected to nearly six hours of questioning about servers and computers found in his home and about his use of child pornography.

While Kinzig did inform Hitchings multiple times that he was free to leave, not answer questions, and not under arrest, these warnings happened during the initial stages of the nearly six-hour-long interrogation. (Government Exhibit 1 at 6:35:50; 6:39:38-6:39:43; 6:40:55-6:41:10.) The Sixth Circuit has held that these warning are the "most important" factor in assessing whether a defendant was subject to custodial interrogation. *United States v. Swanson*, 341 F.3d 524, 530

6

(6th Cir. 2003); *United States v. Holt*, 751 F. App'x 820, 824 (6th Cir. 2018). However, that by no means suggests that this lone factor is dispositive. *See Coomer v. Yukins*, 533 F.3d 477, 487 (6th Cir. 2008) (quoting *Stansbury*, 511 U.S. at 325 ("[N]o one factor is 'dispositive of the custody issue'")). Hitchings was informed he could leave or refuse to answer questions in the very early stages of a nearly six-hour interview; moreover, he was handcuffed again after receiving these warnings. (Government Exhibit 1 at 7:24:08.) Simply advising a suspect that they are free to leave in the first few minutes of an extended interrogation cannot be interpreted as a way for the police to declare an entire interrogation non-custodial.

The Government also stresses that Hitchings was offered the opportunity to have the handcuffs removed after his emotional outburst and he opted to keep them on. Hitchings' freedom of movement was, nonetheless, restrained while he had the handcuffs on. Indeed, when the handcuffs were initially placed on Hitchings, Kunkleman told Hitchings, "if you want to act like a dick, we'll treat you like one." (Government Exhibit 1 at 7:24:50-7:24:54.) It is a stretch to imagine that a reasonable person would believe that they could subsequently ask to have the handcuffs removed and, in the same breath, ask to leave an interview room entirely.

Therefore, based on the totality of the circumstances, the Court finds that Hitchings was subject to a custodial interrogation.

    c. **Voluntary, Knowing, and Intelligent Waiver of *Miranda* Rights**

A defendant may waive their *Miranda* rights, "provided the waiver is made voluntarily, knowingly and intelligently." *Miranda*, 384 U.S. at 444. The waiver inquiry has two dimensions:

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the 'totality of the circumstances surrounding the interrogation' reveal both an uncoerced choice and the requisite level of

comprehension may a court properly conclude that the Miranda rights have been waived.

*Williams v. Houk*, 676 F. App'x 524, 537 (6th Cir. 2017) (quoting *Moran v. Burbine*, 475 U.S. 412, 421 (1986)).

The Court examines "'the particular facts and circumstances surrounding [the] case, including the background, experience, and conduct of the accused." *Garner v. Mitchell*, 557 F.3d 257, 261 (6th Cir. 2009) (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464, 58 S. Ct. 1019 (1938)). Indeed, the relevant question is:

> not whether the 'criminal suspect [knew] and [understood] every possible consequence of a waiver of the Fifth Amendment privilege,' but rather whether the 'suspect [knew] that he [could] choose not to talk to law enforcement officers, to talk only with counsel present, or to discontinue talking at any time.'

*Garner*, 557 F.3d at 261 (quoting *Colorado v. Spring*, 479 U.S. 564, 574, 107 S. Ct. 851, 93 L. Ed. 2d 954 (1987)). Whether a suspect's waiver of their Fifth Amendment rights was "knowing and intelligent" is determined based on the "totality of the circumstances." *Williams*, 676 F. App'x at 537 (citing *Garner*, 557 F. 3d at 260)).

Hitchings argues that he did not voluntarily, knowingly, and intelligently waive his *Miranda* rights because his actions were contradictory. (Doc. No. 34 at PageID 196-97.) Specifically, Hitchings argues that after he was read his *Miranda* rights by Kinzig he stated, "I'm not waiving them, but I understand them; or whatever the expression is" (Government Exhibit 1 at 6:44:15-6:4418) and, therefore, he believed he was making off-the-record statements. (Doc. No. 34 at PageID 196.) In response, the Government argues that Hitchings clearly understood his rights because he asserted them several times by refusing to answer questions. (Doc. No. 35 at PageID 246.)

8

The Court finds that Hitchings voluntarily, knowingly, and intelligently waived his *Miranda* rights. The evidence shows that Hitchings' first language is English, that he can read and write, and that he had a high school diploma with vocational training in computer networking. (Government Exhibit 1 at 6:43:25-6:44:00.) Hitchings was read his *Miranda* rights by Kinzig and he confirmed that he understood his rights. (*Id*. at 6:44:00-6:44:55.) He then signed a form that set forth his *Miranda* rights and confirmed that he understood what his rights were and that he would answer questions without an attorney present. (*Id*. at 6:44:56-6:45:15; Government Exhibit 2.) Hitchings subsequently refused to answer several questions during the course of the interview, including refusing to give Kinzig the passwords to his servers. (Government Exhibit 1 at 6:55:58-6:56:00; 6:58:52; 7:08:42-7:08:46; 7:15:30-7:15:38; 7:15:38-7:16:16.) Throughout the interview, Hitchings also appeared to understand the precise nature of what law enforcement was looking for and the purpose of the interview. It does not appear that Hitchings was confused by his rights or by the circumstances of the interrogation. Indeed, Hitchings' refusal to answer questions, including questions that may lead to the discovery of incriminating information, and his subsequent invocation of his right to counsel demonstrates that he understood his rights and the consequences of abandoning them.

Therefore, the Court finds that Hitchings voluntarily, knowingly, and intelligently waived his *Miranda* rights.

### d. Invocation of Right to Counsel

In *Edwards*, the Supreme Court held that once a suspect invokes their right to counsel, the police must immediately stop their questioning. *Edwards*, 451 U.S. at 482. However, the invocation must be unambiguous and, if the invocation is ambiguous or equivocal, the police need not cease their questioning. *Franklin v. Bradshaw*, 545 F.3d 409, 414 (6th Cir. 2008) (citing *Davis*

9

*v. United States*, 512 U.S. 452, 457, 114 S. Ct. 2350 (1994)); *United States v. Amawi*, 695 F.3d 457, 485 (6th Cir. 2012); *United States v. Mays*, 683 F. App'x 427, 432 (6th Cir. 2017).  The suspect must assert their right to counsel with sufficient clarity that a reasonable officer, under the circumstances, would understand it as a request for counsel.  *United States v. Delaney*, 443 F. App'x 122, 130 (6th Cir. 2011) (citing *Davis*, 512 U.S. at 459)); *Awami*, 695 F.3d at 485; *Williams*, 676 F. App'x at 536; *Mays*, 683 F. App'x at 432.

However, a suspect who has invoked their right to counsel remains free to change their mind.  *Bachynski v. Stewarts*, 813 F.3d 241, 246 (6th Cir. 2015); *United States v. Guffin*, No. 21-5311, 2022 U.S. App. LEXIS 537, at *4, 2022 WL 59616 (6th Cir. Jan. 6, 2022).  The Court may admit statements made by the suspect after their invocation of their right to counsel if the suspect initiates further conversation with the police.  *Guffin*, 2022 U.S. App. LEXIS 537, at *4-5 (citing *Bachynski*, 813 F.3d at 246)).  A suspect initiates further conversation with the police "when, without influence by the authorities, the suspect shows a willingness and a desire to talk generally about his case." *Davie v. Mitchell*, 547 F.3d 297, 305 (6th Cir. 2008).  "A waiver of an expressed right to counsel 'cannot be established by showing only that [the suspect] responded to further police-initiated custodial interrogation even if he has been advised of his rights.'"  *United States v. Whaley*, 13 F.3d 963, 968 (6th Cir. 1994) (quoting *Edwards*, 451 U.S. at 484)); *see also Bachynski*, 813 F.3d at 246 (holding that, once the right to counsel has been invoked, the police may not approach the suspect for further interrogation).  The suspect's waiver of their right to counsel must be determined to have been knowing and intelligent.  *United States v. Ware*, 63 F. App'x 863, 868 (6th Cir. 2003).

An interrogation occurs when the police "'should have known' that their conduct was 'reasonably likely to elicit an incriminating response.'"  *Bachynski,* 813 F.3d at 246 (quoting

10

*Rhode Island v. Innis*, 446 U.S. 291, 301-02, 100 S. Ct. 1682 (1980)). This includes both "express questioning" and the "functional equivalent" of such questioning—"'any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response.'" *Bachynski,* 813 F.3d at 246 (quoting *Innis*, 446 U.S. at 301)).

Hitchings argues that at 7:22 a.m. he invoked his right to counsel by stating, "I'm not answering your questions anymore give me a [explicative] attorney. Please give me an attorney." (Doc. No. 34 at PageID 199.) He further argues that Kinzig and Kunkleman failed to honor his request and encouraged further discussion, eventually resuming their interrogation without reiterating Hitchings' *Miranda* rights. (*Id*.) In response, the Government argues that Hitchings' statement was ambiguous because immediately after asking for counsel he made additional comments that made his request equivocal. (Doc. No. 35 at PageID 249-51.) The Government further argues that Hitchings reinitiated the conversation with Kinzig and Kunkleman when he asked Kinzig not to leave the interrogation. (*Id*. at PageID 251-52.)

The Court finds that Hitchings clearly and unequivocally invoked his right to counsel initially. However, the Court further finds that Hitchings immediately reinitiated the conversation with investigators. The relevant exchange occurred as follows:

> Hitchings: Lawyer. I have to have a lawyer from this point on. Don't I?
> Kinzig: It's up to you.
> Hitchings: I want to help you, but it doesn't matter. I'm already dead anyway, so it doesn't fucking matter. I'm not answering questions anymore until you find me an attorney. Please find me an attorney.
> Kinzig: Okay.
> Hitchings: That's what I'm supposed to do, right?
> Kinzig: It's your choice.
> Kunkleman: It's up to you, William.
> Hitchings: Tell me honestly, like what do you think I. . .
> Kunkleman: Look I'm going to tell you honestly, okay. You want my opinion?
> Hitchings: I do.

11

> Kunkleman: I think it's always better to cooperate. I think it goes better in the court system. . . . .

(Government Exhibit 1 at 7:22:20-7:22:58.)

Hitchings' statement, "I'm not answering questions anymore until you find me an attorney. Please find me an attorney," is a clear invocation of the right to counsel. No reasonable officer could understand this phrase as ambiguous. The issue for Hitchings arrives in his follow-up statements. He immediately asks, "[t]hat's what I'm supposed to do, right," followed by asking for an honest opinion, inviting continued discussion.

This exchange is analogous to the situation in *Bush*. In *Bush*, the defendant asked for a lawyer and the interviewer informed him that he could not ask him any more questions. *Bush*, 573 F. App'x at 505. The interviewer and Bush then had the following exchange:

> BUSH: If I don't like—would it look better for me if I just go ahead and just tell you all? I mean, would it be better for me?
> INTERVIEWER: You want my personal opinion?
> BUSH: Yeah, truthfully.
> INTERVIEWER: The truth is always going to be better. That's my personal opinion.

*Id*. The Sixth Circuit held that, while Bush's request for a lawyer triggered the protections of *Edwards*, "Bush continued discussion with the interviewers on his own initiative." *Id*. at 513. Therefore, the investigators were "free to listen to Bush's 'voluntary, volunteered statements.'" *Id*. (quoting *Edwards*, 451 U.S. at 485).

While Kunkleman's later statement, "[w]hy sit here and say, 'yeah I got child porn' and then shut up," appears to be concerning, Hitchings had already reinitiated the conversation, asked for Kunkleman's opinion regarding his situation, and evinced "a desire for a generalized discussion about the investigation." *Ware*, 63 F. App'x at 868. And, prior to Kinzig restarting a substantive conversation regarding Hitchings' possession of child pornography, she asked Hitchings multiple

12

times whether he wanted an attorney. (Government Exhibit 1 at 7:28:18-7:29:25.) Hitchings made clear that he would talk to them and that he did not want an attorney. (*Id.*) Indeed, it is clear from Hitchings' previous answers regarding his *Miranda* rights and his comments on his need for counsel that he understood the gravity of the situation and made his decision knowingly. *See Ware*, 63 F. App'x at 868.

Therefore, the Court finds that, initially, Hitchings clearly and unequivocally invoked his right to counsel, but he immediately reinitiated the conversation with investigators and subsequently waived his right to counsel.

### e. **Free and Voluntary Statements**

Before a confession is admissible, it "must be free and voluntary; that is, [it] must not be extracted by any sort of threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence." *Bram v. United States*, 168 U.S. 532, 542-43, 18 S. Ct. 183 (1897) (internal quotation and citation omitted); *see also Connelly*, 479 U.S. at 167 (holding that "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment"). An admission is deemed to have been coerced where the conduct of law enforcement officials was such as to overbear the accused's will to resist, resulting in a confession that was not freely self-determined. *Beckwith v. United States*, 425 U.S. 341, 347-48, 96 S. Ct. 1612 (1976) (quoting *Rogers v. Richmond*, 365 U.S. 534, 544, 81 S. Ct. 735 (1961)). The ultimate inquiry, when evaluating whether a confession was coerced, is whether it was "the product of an essentially free and unconstrained choice by its maker." *Schneckloth v. Bustamonte*, 412 U.S. 218, 225, 93 S. Ct. 2041, 36 L. Ed. 2d 854 (1973).

In determining whether a statement by a suspect is voluntary, the Court must consider

"'whether a defendant's will was overborne by the circumstances surrounding the giving of a [statement].'" *Dickerson v. United States*, 530 U.S. 428, 434, 120 S. Ct. 2326 (2000) (quoting *Schneckloth*, 412 U.S. at 226). Courts must consider the totality of the circumstances in determining the voluntariness of coerced statements, including: (1) whether there was police coercion; (2) the length of the interrogation; (3) the location of the interrogation; (4) the continuity of the interrogation; (5) the suspect's maturity; (6) the suspect's education; (7) the suspect's physical condition and mental health; and, (8) whether the suspect was advised of his or her *Miranda* rights. *Withrow v. Williams*, 507 U.S. 680, 693-94, 113 S. Ct. 1745 (1993).

Hitchings argues that his incriminating statement were not made freely or voluntarily because he had used marijuana and methamphetamine prior to his interrogation. (Doc. No. 34 at PageID 201.) He further argues that his mental state and contradictory statements regarding his *Miranda* rights further evidence that he did not understand the gravity of the situation. (*Id.*) In response, the Government argues that Hitchings was given multiple breaks during the interrogation, that he was not impaired during the interrogation (he had a tolerance for the controlled substances), that Hitchings stated he was "fully aware" during the interrogation, and that his education and intelligence demonstrate the voluntariness of his statements. (Doc. No. 35 at PageID 253-54.)

The Court finds that Hitchings' statements were free and voluntary. Much of the analysis is similar to the analysis regarding Hitchings' voluntary, knowing, and intelligent waiver of his *Miranda* rights. The evidence shows that Hitchings' first language is English, that he can read and write, and that he had earned a high school diploma with vocational training in computer networking. (Government Exhibit 1 at 6:43:25-6:44:00.) Hitchings was read his *Miranda* rights by Kinzig and he confirmed that he understood his rights. (*Id.* at 6:44:00-6:44:55.) He then signed

a form that set forth his *Miranda* rights and confirmed that he understood what his rights were and that he would answer questions without an attorney present. (*Id*. at 6:44:56-6:45:15; Government Exhibit 2.) Hitchings was given snacks, drinks, and bathroom breaks on several occasions. (Doc. No. 33 at PageID 161.) Hitchings was also able to take several breaks during the course of the interrogation. (*Id*. at PageID 165.)

Although Hitchings was interrogated for six hours in a windowless room in the TPD, he was obviously suffering from some degree of emotional distress, and he had used both marijuana and methamphetamine on the morning of his interrogation, these factors are insufficient to render his statements involuntary. The Sixth Circuit has held on several occasions that, without "coercive police activity," the use of controlled substances is insufficient to render statements involuntary. *United States v. Chapman*, 112 F. App'x 469, 474 (6th Cir. 2004) (quoting *Connelly*, 479 U.S. at 167); *United States v. Treadwell*, 11 F. App'x 502, 511 (6th Cir. 2001); *United States v. Dunn*, 269 F. App'x 467, 572-73 (6th Cir. 2008); *United States v. Brown*, 443 F. App'x 956, 959 (6th Cir. 2011). Indeed, in *Dunn* the Sixth Circuit noted the magistrate's finding that the defendant was "alert, coherent, and lucid," and that he "was alert and quick to respond to questions, and appeared to understand his *Miranda* rights." *Dunn*, 269 F. App'x at 573. Similarly, Hitchings was alert and quick to respond to questions. Kinzig, who is familiar with interacting with impaired individuals, also did not believe Hitchings was impaired. (Doc. No. 33 at PageID 153-54.) Moreover, Hitchings actively participated in the interrogation and selectively refused to answer various questions.

Similarly, the fact that Hitchings was in a distressed mental state is insufficient on its own to render his statements involuntary. *See Poole v. Stewart*, No. 16-1729, 2017 U.S. App. LEXIS 13031, at *10, 2017 WL 3014000 (6th Cir. Jul. 14, 2017) (citing *Connelly*, 479 U.S. at 164-65)

("While [the defendant] may have been in a distressed mental state at the time she was questioned, that fact alone does not render her statements involuntary"); *Herndon v. Bell*, No. 1:07-cv-285, 2010 U.S. Dist. LEXIS 28752, at *60, 2010 WL 1172549 (W.D. Mich. Feb. 22, 2010) ("the fact that [the defendant's] mental state may have been agitated or even suicidal is insufficient to undermine the voluntariness of the confession"). Hitchings was actively involved in the interrogation and, while he did have emotional outbursts, he had long periods of time where he freely interacted with the police with no signs of distress or confusion.

Therefore, the Court finds that Hitchings statements were free and voluntary.

### III. CONCLUSION

For the reasons stated above, the Court **DENIES** Defendant William S. Hitchings' Motion to Suppress Statements (Doc. No. 31).

**DONE** and **ORDERED** in Dayton, Ohio, this Monday, March 14, 2022.

s/Thomas M. Rose

THOMAS M. ROSE
UNITED STATES DISTRICT JUDGE